**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

**PORTLAND DIVISION**


**SUE LYNNE TIPPETT,**                              **3:10-CV-1427-BR**

        **Plaintiff,**

                                        **OPINION AND ORDER**

**v.**

**COMMISSIONER OF SOCIAL
SECURITY,**

        **Defendant.**


**DAVID B. LOWRY**
9900 SW Greenburg Road
Columbia Business Center, Suite 130
Portland, OR 97223
(503) 245-6309

        Attorney for Plaintiff


1 - OPINION AND ORDER

**S. AMANDA MARSHALL**
United States Attorney
District of Oregon
**ADRIAN L. BROWN**
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR  97204-2902
(503) 727-1003

**DAVID MORADO**
Regional Chief Counsel
**FRANCO L. BECIA**
Special Assistant United States Attorney
Social Security Administration
701 5th Avenue, Suite 2900 M/S 221A
Seattle, WA  98104-7075
(206) 615-2522

        Attorneys for Defendant


**BROWN, Judge.**

    Plaintiff Sue Lynne Tippett seeks judicial review of a final
decision of the Commissioner of the Social Security Admini-
stration (SSA) in which he denied Plaintiff's applications for
Supplemental Security Income (SSI) and Disability Insurance
Benefits (DIB) under Titles XVI and II of the Social Security
Act.  This Court has jurisdiction to review the Commissioner's
final decision pursuant to 42 U.S.C. § 405(g).

    Following a review of the record, the Court **AFFIRMS** the
decision of the Commissioner and **DISMISSES** this matter.


## <u>ADMINISTRATIVE HISTORY</u>

    Plaintiff filed her applications for SSI and DIB on

2 - OPINION AND ORDER

February 23, 2007, and alleged a disability onset date of July 1, 2003.  Tr. 126-36.[1]  The applications were denied initially and on reconsideration.  An Administrative Law Judge (ALJ) held a hearing on February 9, 2010.  Tr. 29-62.  At the hearing, Plaintiff was represented by an attorney.  Plaintiff and a vocational expert (VE) testified.

The ALJ issued a decision on May 7, 2010, in which she found Plaintiff was not entitled to benefits.  Tr. 10-28.  That decision became the final decision of the Commissioner on September 20, 2010, when the Appeals Council denied Plaintiff's request for review.  Tr. 1-5.

## BACKGROUND

Plaintiff was born on August 23, 1962, and was 47 years old at the time of the hearing.  Tr. 31, 128.  Plaintiff has a high-school education.  Tr. 36.  Plaintiff has past relevant work experience as a truck driver, retail sales clerk, general office clerk, and flagger.  Tr. 53-55, 153.

Plaintiff alleges disability due to lumbar degenerative disc disease, scoliosis, arthritis, hypothyroidism, obesity, knee pain, and depression.  Tr. 33, 39, 152.

Except when noted, Plaintiff does not challenge the ALJ's

---

[1]  Citations to the official transcript of record filed by the Commissioner on March 24, 2011, are referred to as "Tr."

3 - OPINION AND ORDER

summary of the medical evidence.  After carefully reviewing the
medical records, the Court adopts the ALJ's summary of the
medical evidence.  *See* Tr. 18-22.


## STANDARDS

The initial burden of proof rests on the claimant to
establish disability.  *Ukolov v. Barnhart*, 420 F.3d 1002, 1004
(9th Cir. 2005).  To meet this burden, a claimant must
demonstrate her inability "to engage in any substantial gainful
activity by reason of any medically determinable physical or
mental impairment which . . . has lasted or can be expected to
last for a continuous period of not less than 12 months."
42 U.S.C. § 423(d)(1)(A).  The Commissioner bears the burden of
developing the record.  *Reed v. Massanari*, 270 F.3d 838, 841
(9th Cir. 2001).

The district court must affirm the Commissioner's decision
if it is based on proper legal standards and the findings are
supported by substantial evidence in the record as a whole.
42 U.S.C. § 405(g).  *See also Batson*, 359 F.3d at 1193.
"Substantial evidence means more than a mere scintilla, but
less than a preponderance, i.e., such relevant evidence as a
reasonable mind might accept as adequate to support a
conclusion."  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th
Cir. 2006)(internal quotations omitted).

4 - OPINION AND ORDER

The ALJ is responsible for determining credibility, resolving conflicts in the medical evidence, and resolving ambiguities. *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). The court must weigh all of the evidence whether it supports or detracts from the Commissioner's decision. *Robbins,* 466 F.3d at 882. The Commissioner's decision must be upheld even if the evidence is susceptible to more than one rational interpretation. *Webb v. Barnhart*, 433 F.3d 683, 689 (9th Cir. 2005). The court may not substitute its judgment for that of the Commissioner. *Widmark v. Barnhart*, 454 F.3d 1063, 1070 (9th Cir. 2006).

## DISABILITY ANALYSIS

The Commissioner has developed a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). *See also* 20 C.F.R. § 404.1520. Each step is potentially dispositive.

In Step One, the claimant is not disabled if the Commissioner determines the claimant is engaged in substantial gainful activity. *Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1052 (9th Cir. 2006). *See also* 20 C.F.R. § 404.1520(a)(4)(I).

In Step Two, the claimant is not disabled if the

Commissioner determines the claimant does not have any medically severe impairment or combination of impairments. *Stout*, 454 F.3d at 1052. *See also* 20 C.F.R. § 404.1520(a)(4)(ii).

In Step Three, the claimant is disabled if the Commissioner determines the claimant's impairments meet or equal one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. *Stout*, 454 F.3d at 1052. *See also* 20 C.F.R. § 404.1520(a)(4)(iii). The criteria for the listed impairments, known as Listings, are enumerated in 20 C.F.R. part 404, subpart P, appendix 1 (Listed Impairments).

If the Commissioner proceeds beyond Step Three, he must assess the claimant's RFC. The claimant's RFC is an assessment of the sustained, work-related physical and mental activities the claimant can still do on a regular and continuing basis despite her limitations. 20 C.F.R. § 404.1520(e). *See also* Soc. Sec. Ruling (SSR) 96-8p. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent schedule." SSR 96-8p, at *1. In other words, the Social Security Act does not require complete incapacity to be disabled. *Smolen v. Chater*, 80 F.3d 1273, 1284 n.7 (9th Cir. 1996). The assessment of a claimant's RFC is at the heart of Steps Four and Five of the sequential analysis engaged in by the ALJ when determining whether a claimant can still work despite severe medical

impairments.  An improper evaluation of the claimant's ability to perform specific work-related functions "could make the difference between a finding of 'disabled' and 'not disabled.'" SSR 96-8p, at *4.

In Step Four, the claimant is not disabled if the Commissioner determines the claimant retains the RFC to perform work she has done in the past. *Stout*, 454 F.3d at 1052. *See also* 20 C.F.R. § 404.1520(a)(4)(iv).

If the Commissioner reaches Step Five, he must determine whether the claimant is able to do any other work that exists in the national economy. *Stout*, 454 F.3d at 1052. *See also* 20 C.F.R. § 404.1520(a)(4)(v).  Here the burden shifts to the Commissioner to show a significant number of jobs exist in the national economy that the claimant can do. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).  The Commissioner may satisfy this burden through the testimony of a VE or by reference to the Medical-Vocational Guidelines set forth in the regulations at 20 C.F.R. part 404, subpart P, appendix 2.  If the Commissioner meets this burden, the claimant is not disabled.  20 C.F.R. § 404.1520(g)(1).

## **ALJ'S FINDINGS**

At Step One, the ALJ found Plaintiff has not engaged in substantial gainful activity since her onset date of

7 - OPINION AND ORDER

July 1, 2003.  Tr. 15.

At Step Two, the ALJ found Plaintiff has the severe impairments of lumbar degenerative disc disease, scoliosis, arthritis, hypothyroidism, and obesity.  Tr. 15.

At Step Three, the ALJ concluded Plaintiff's medically determinable impairments do not meet or equal the criteria for any Listed Impairments in C.F.R. part 404, subpart P, appendix 1. Tr. 15.  The ALJ found Plaintiff is able to perform light work and that Plaintiff "should never climb ladders, ropes or scaffolds, and should avoid exposure to concentrated hazards such as moving equipment and heights."  Tr. 17.

At Step Four, the ALJ concluded Plaintiff was able to perform past relevant work as a general office clerk, sales clerk, and flagger.  Tr. 23.  Consequently, the ALJ did not reach Step Five.


**<u>DISCUSSION</u>**

Plaintiff contends the ALJ erred when she (1) rejected Plaintiff's testimony as not credible; (2) rejected the opinion of Family Nurse Practitioner (FNP) Elisa Engbretson; (3) rejected the opinion of examining consultative psychologists Amy M. Kobus, Ph.D., and Jerome S. Gordon, Ph.D.; (4) failed to develop the record; and (5) improperly assessed Plaintiff's RFC.


8 - OPINION AND ORDER

I.    **The ALJ gave clear and convincing reasons for rejecting Plaintiff's testimony**.

Plaintiff alleges the ALJ erred when she failed to give clear and convincing reasons for rejecting Plaintiff's testimony as not credible.

In *Cotton v. Bowen* the Ninth Circuit established two requirements for a claimant to present credible symptom testimony:  The claimant must produce objective medical evidence of an impairment or impairments, and she must show the impairment or combination of impairments could reasonably be expected to produce some degree of symptom.  *Cotton*, 799 F.2d 1403, 1407 (9th Cir. 1986).  The claimant, however, need not produce objective medical evidence of the actual symptoms or their severity.  *Smolen*, 80 F.3d at 1284.

If the claimant satisfies the above test and there is not any affirmative evidence of malingering, the ALJ can "reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so."  *Williamson v. Comm'r of Soc. Sec.*, No. 10-35730, 2011 WL 2421147 (9th Cir. June 17, 2011)(quoting *Lingenfelter v. Astrue,* 504 F.3d 1028, 1036 (9th Cir. 2007)).  General assertions that the claimant's testimony is not credible are insufficient.  *Parra v. Astrue,* 481 F.3d 742, 750 (9th Cir. 2007).  The ALJ must identify "what testimony is not credible and what evidence undermines the claimant's complaints."  *Id.* (quoting *Lester v. Chater*, 81 F.3d

9 - OPINION AND ORDER

821, 834 (9ᵗʰ Cir. 1995)).

Plaintiff testified she suffers from significant back and knee pain. On a scale of one to ten, Plaintiff reported she would rate her pain as a ten without medication, between six and seven on bad days with medication, and between four and five on good days with medication. Tr. 39. Plaintiff testified sitting for thirty minutes to an hour even with medication would result in an "extremely high" level of pain when she stands. Tr. 44. Plaintiff reported she has to sleep sitting up because her night-time pain prevents her from lying down to sleep. Tr. 167. Plaintiff noted she is able to dress, to bathe, and to care for her hair, but she has to rest for fifteen to twenty minutes between showering and getting dressed because of her back pain. Tr. 165, 167. On March 4, 2007, Plaintiff reported she "never" took walks and that the farthest she could walk without resting was the sixty yards to her mailbox. Tr. 165. Plaintiff further reported her fiancé prepares most of her meals because Plaintiff's pain prevents her from standing long enough to prepare food other than sandwiches and toast. Tr. 160, 165, 167-68. Plaintiff also reported that her depression, despite her antidepressant medications, prevents her from having "normal conversations" without crying and prevents her from leaving the house for extended periods of time. Tr. 45. Plaintiff testified her depression at one point prevented her from leaving her house

10 - OPINION AND ORDER

for a three-month period.  Tr. 45.  Plaintiff, however, also
noted she has "no problem" paying attention and is able to follow
written and spoken instructions "very well."  Tr. 171.  Plaintiff
further reported she uses a computer daily to socialize and to
play games.  Tr. 166, 170.

The ALJ found Plaintiff's medically determinable impairments
"could reasonably be expected to cause some of the alleged
symptoms; however, [Plaintiff's] statements concerning the
intensity, persistence, and limiting effects of these symptoms
are not credible to the extent they are inconsistent with the
[RFC]."  Tr. 18.

The ALJ found Plaintiff's testimony (1) conflicted with
evidence of Plaintiff's daily life activities; (2) conflicted
with the medical record of Plaintiff's conservative but generally
effective treatment course; and (3) indicated she "may be able to
work, but no longer has the desire to work."  Tr. 18-19.

The ALJ also found the reports of Plaintiff's daily
activities provided by Plaintiff's fiancé and Dr. Kobus described
a level of functioning that conflicted with Plaintiff's
testimony.  Tr. 18.  Plaintiff's fiancé, Duane Foreman, reported
Plaintiff is "independent in her personal care, does not need
reminders, prepares daily meals, does laundry, [and] goes grocery
shopping."  Tr. 16.  In his Third-Party Function Report, Foreman
reported Plaintiff does not have problems paying attention or

following written and spoken instruction.  Tr. 192.  Foreman also confirmed that Plaintiff is able to shower and to dress herself, but she has to rest between showering and dressing; is able to prepare quick snacks for herself; and is able to do laundry every three days even though Foreman has to lift the laundry basket for her.  Tr. 188-89.

Dr. Kobus also summarized Plaintiff's daily life activities and opined "despite having to take breaks or slow down[, Plaintiff] appears to be able to perform most household tasks." Tr. 435.

Moreover, the ALJ noted Plaintiff had received only "conservative and routine treatment."  Tr. 19.  The ALJ pointed out that Plaintiff has not been hospitalized nor has she received "more aggressive forms of treatment such as surgery."  Tr. 19. "Evidence of conservative treatment is a sufficient reason to discount a claimant's testimony regarding severity of an impairment."  *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008)(quoting *Parra,* 481 F.3d at 750-51)(internal quotations omitted).  The ALJ also noted Plaintiff "takes narcotic pain medications for pain relief, but MRI images of [Plaintiff's] spine reveal no more than mild degenerative changes."  Tr. 19. Plaintiff's treatment with methadone" has also been "generally successful in controlling" Plaintiff's symptoms.  Tr. 19. In fact, Plaintiff reported on March 22, 2006, that she was doing

well on methadone, and it was reducing her pain to a level
between a two and three.  Tr. 19, 39, 411.  Plaintiff also
reported on July 14, 2006; August 11, 2006; and September 27,
2006, that antidepressant and therapy treatments were working
well, improving her mood, and allowing her to go outside of
the house.  Tr. 19, 397-98, 390.  On November 22, 2006,
FNP Engbretson noted Plaintiff's dosage of methadone was working
and that Plaintiff's pain-management class was "very helpful".
Tr. 382.  On February 9, 2007, Plaintiff indicated the
supplemental Vicodin prescription was "helping a lot" with her
night-time pain.  Tr. 378.  On January 7, 2007, FNP Tamara
Lundberg, one of Plaintiff's treatment providers at Clackamas
County Community Health Clinic, noted Plaintiff:

> has tried walking daily but finds she 'hurts
> too much' the following day 'walking a mile a
> day.'

Tr. 489 (punctuated as in original).  The ALJ interpreted FPN
Lundberg's note as indicating Plaintiff was able to walk for a
mile a day.  Tr. 19, 489.  Plaintiff, however, alleges the ALJ's
interpretation is inaccurate:  Plaintiff asserts the "mile-a-day"
language referred to her weight-loss program goal of walking a
mile a day, but Plaintiff complained it "hurt too much" to meet
that goal.  Although the record appears to reflect Plaintiff
attempted to walk daily and that the walking caused Plaintiff
some pain, there is other evidence in the record that supports

the ALJ's assertion that Plaintiff is able to get out of the house and to take walks.  For example, medical records dated January 4, 2008, indicate Plaintiff was walking less far but walking with more consistency almost a year later.  Tr. 488. Viewing the record as a whole, the Court finds the ALJ's general conclusion that Plaintiff's treatment has allowed her to engage in a limited, if ultimately undetermined, amount of walking exercise is supported by medical evidence in the record.

On January 25, 2008, Plaintiff also noted her prescriptions were working "okay," but she was having a hard time adjusting to her new antidepressant.  Tr. 487.  The ALJ notes Plaintiff's treatment provider observed on March 6, 2008, that Plaintiff "feels really well this month"; was putting on makeup and walking some; looked great; and had a "good" affect.  Tr. 19, 483. Plaintiff points out FNP Lundberg noted on April 3, 2008, that Plaintiff "looks more uncomfortable than I have seen her in a while," and FNP Lundberg was unable to perform a straight-leg raise because Plaintiff was too uncomfortable to lay down. Tr. 480.  The record, however, reflects the narcotics for treatment of pain and the antidepressant prescriptions were, nevertheless, generally effective in ameliorating and controlling Plaintiff's pain and depression.

The ALJ also noted Plaintiff, who had been employed as a truck driver until she could no longer work because of her pain,

was offered the opportunity to be retrained, but she refused because other jobs "do not pay as much as truck driving." Tr. 19. Although Plaintiff testified she also refused retraining in part because she thought time off from work as a truck driver would heal her and she could then return to her job and receive her previous salary, the ALJ found Plaintiff's refusal to retrain because she would receive lower pay indicates, together with other medical evidence in the record, that Plaintiff is able to work, but lacks the desire to do so. Tr. 19, 43, 267.

After considering the record as a whole, the Court finds the ALJ provided clear and convincing reasons supported by substantial evidence in the record for finding Plaintiff's testimony not entirely credible as to the intensity, persistence, and limiting effects of her impairments. The Court, therefore, concludes the ALJ did not err when she rejected Plaintiff's testimony in part.

## II. The ALJ did not err when she discounted the opinion of FNP Engbretson.

Plaintiff contends the ALJ erred when she rejected the opinion of FNP Engbretson.

Medical sources are divided into two categories: "acceptable" and "not acceptable." 20 C.F.R. § 404.1502. Acceptable medical sources include licensed physicians and psychologists. 20 C.F.R. § 404.1502. Medical sources classified as "not acceptable" include, but are not limited to, nurse

15 - OPINION AND ORDER

practitioners, therapists, licensed clinical social workers, and chiropractors.  SSR 06-03p, at *2.

If a nurse practitioner is "working closely with, and under the supervision of" a physician, however, the nurse practitioner's "opinion is to be considered that of an acceptable medical source."  *Taylor v. Comm'n of Soc. Sec. Admin.*, No. 10-35732, 2011 WL 5084856, at *4 (9th Cir. Oct. 27, 2011)(internal quotations omitted)(citing *Gomez v. Chater*, 74 F.3d 967, 971 (9th Cir. 1996)(nurse practitioner considered an acceptable medical source because she "worked closely under the supervision of [the physician] and . . . was acting as an agent of [the physician]."").  *See also Angst v. Astrue*, 351 Fed. App'x 227, 228 (9th Cir. 2009)(unpubl'd)(a nurse practitioner "acting as an agent" for the treating doctor can be an acceptable medical source)(citing *Gomez v. Chater,* 74 F.3d 967, 971 (9th Cir. 1996)).

Even when a nurse practitioner is not working closely under the supervision of a physician or acting as an agent of a physician, a nurse practitioner's opinions must still be considered as important.

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not acceptable medical sources, such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions

16 - OPINION AND ORDER

> previously handled primarily by physicians
> and psychologists.  Opinions from these
> medical sources, who are not technically
> deemed acceptable medical sources under our
> rules, are important and should be evaluated
> on key issues such as impairment severity and
> functional effects, along with the other
> relevant evidence in the file.

SSR 06-03p, at *3.

Factors the ALJ should consider when determining the weight

to give an opinion from these "important" sources such as nurse

practitioners include:  The length of time the source has known

the claimant and the number of times and frequency that the

source has seen the claimant, the consistency of the source's

opinion with other evidence in the record, the relevance of the

source's opinion, the quality of the source's explanation of her

opinion, and the source's training and expertise.  SSR 06-03p, at

*4.

> Although there is a distinction between what
> an adjudicator must consider and what the
> adjudicator must explain in the disability
> determination or decision, the adjudicator
> generally should explain the weight given to
> opinions from these "other sources," or
> otherwise ensure that the discussion of the
> evidence in the determination or decision
> allows a claimant or subsequent reviewer to
> follow the adjudicator's reasoning, when such
> opinions may have an effect on the outcome of
> the case.

SSR 06-03p, at *6.

The ALJ gave "little weight" to the opinion of FNP

Engbretson.  Tr. 22.  The ALJ noted FNP Engbretson's medical

17 - OPINION AND ORDER

opinion that Plaintiff was "unable to perform even sedentary work" but had only moderate impairments in activities of daily living, social functioning, and concentration.  The ALJ, however, concluded FNP Engbretson's opinion warranted little weight "in light of other acceptable medical source statements" in the record and because FNP Engbretson's treatment relationship with Plaintiff primarily consisted of providing Plaintiff with prescription refills.  Tr. 22.

### A.    The ALJ properly determined FNP Engbretson is not an "acceptable medical source."

Plaintiff contends FNP Engbretson worked closely under the supervision of both Kimberly Schleef, D.O., at Clackamas County Community Health Clinic and Richard Block, M.D., at Silverton Hospital, and, therefore, FNP Engbretson's opinion should be treated as an "acceptable medical source."

Plaintiff's argument that FNP Engbretson was acting under the supervision of and as an agent for Dr. Schleef is not supported by the record.  Plaintiff testified she saw Dr. Schleef before she saw FNP Engbretson.  Tr. 52.  According to Plaintiff, Dr. Schleef allowed Plaintiff to choose a nurse practitioner when she transferred out of the clinic, and Plaintiff chose to see FNP Engbretson.  Tr. 52.  Plaintiff further testified, however, that she did not know which physician FNP Engbretson worked under after she began seeing FNP Engbretson.  Tr. 52.  The record does not reflect Dr. Schleef

18 - OPINION AND ORDER

signed off on FNP Engbretson's opinion or diagnosis nor is there any evidence to indicate the type of close relationship between Dr. Schleef and FNP Engbretson that would render FNP Engbretson an "acceptable medical source."

Plaintiff's argument that FNP Engbretson was acting under the supervision of and as an agent for Dr. Block is also unsupported by the record.  The record reflects FNP Engbretson referred Plaintiff to Dr. Block for treatment of Plaintiff's knee pain.  Tr. 620.  Although Dr. Block indicates FNP Engbretson is Plaintiff's Primary Care Provider (PCP), all of the reports from Silverton Hospital are signed by Dr. Block himself, and, other than Plaintiff's prior pain medication, there is not any indication that FNP Engbretson took part in Dr. Block's treatment of Plaintiff's knee pain.  Tr. 666, 668.  In short, the record does not reflect the type of close relationship between Dr. Block and FNP Engbretson that would render FNP Engbretson an "acceptable medical source" within the meaning of 20 C.F.R. § 404.1502

**B.   The ALJ properly evaluated FNP Engbretson's opinion as "other source" evidence.**

As noted, even when a nurse practitioner's opinion is not "technically deemed [an] acceptable medical sourc[e]," it is "important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file."  SSR 06-03p, at *3.  When

19 - OPINION AND ORDER

evaluating a nurse practitioner's opinion, the ALJ must provide sufficient information to allow a "subsequent reviewer to follow the adjudicator's reasoning." *Id.*

The ALJ discounted FNP Engbretson's opinion for two reasons: (1) because FNP Engbretson's treatment primarily consisted of refilling prescriptions and (2) because FNP Engbretson's opinion was not consistent with the opinions of "acceptable medical sources" in the record.

FNP Engbretson describes her role in Plaintiff's treatment on July 18, 2007 as follows:

> Patient seen in clinic since [July 2005] by another provider, Dr. Kimberly Schleef, until [Sept. 27, 2006] when provider left clinic. I have seen [Plaintiff] since [November 2006] primarily to refill methadone and Lortrab for chronic low back pain she has had since 1995. MRI done [on June 6, 2003] by an outside provider shows mild lateral disc bulge on the L4 nerve root.  [Plaintiff] has participated in pain management groups here at clinic and continues to participate in a monthly support group.  [Plaintiff's c]urrent level of functioning is not expected to change."

Tr. 467, 470.  In a "concurrence letter" provided by Plaintiff's attorney, FNP Engbretson describes her treatment of Plaintiff as "primarily for her back and knee problems" and explained she "examine[d Plaintiff] and prescribe[d] medication for her pain and depression."  Tr. 218-19.  Plaintiff's medical records also indicate FNP Engbretson's relationship with Plaintiff was not strictly limited to refilling Plaintiff's prescriptions.  *See*

20 - OPINION AND ORDER

Tr. 372-82.  From approximately November 22, 2006, until
October 19, 2007, FNP Engbretson prescribed and refilled
Plaintiff's pain and depression medications and at times provided
her with other routine services.  Tr. 372-82, 491-94.  There is
also evidence that other doctors considered FNP Engbretson to be
Plaintiff's primary treatment provider.  Dr. Block, who operated
on Plaintiff's knee, indicates in his notes on December 22,
2009, that FNP Engbretson referred Plaintiff to him and lists
FNP Engbretson as Plaintiff's primary care provider throughout
his treatment of Plaintiff and surgery for knee pain.  Tr. 650,
665-66, 668.  Similarly, records from the Willamette Falls
Hospital and Adventist Health list FNP Engbretson as Plaintiff's
"physician."  Tr. 505-07.

Nevertheless, there is also sufficient evidence in the
record to support the ALJ's conclusion that the relationship
between FNP Engbretson and Plaintiff consisted *primarily* of
prescribing medication refills.  FNP Engbretson, in fact,
characterizes her treatment relationship with Plaintiff as
focusing primarily on medication refills.  Tr. 467.  A review of
the Clackamas County Public Health Division Patient Visit Record
and FNP Engbretson's progress notes also show the majority of
Plaintiff's visits with FNP Engbretson were essentially for
obtaining medication refills or were merely follow-up
appointments to adjust Plaintiff's medications.  *See* Tr. 371,

21 - OPINION AND ORDER

373-81, 447, 491-94.  The ALJ's conclusion that FNP Engbretson's
role in Plaintiff's treatment consisted mainly of refilling
prescriptions, therefore, is supported by substantial evidence in
the record.  In any event, the Court, as noted, may not
substitute its judgment for that of the Commissioner.  *Widmark v.
Barnhart*, 454 F.3d 1063, 1070 (9th Cir. 2006).

The ALJ also rejected FNP Engbretson's opinion of
Plaintiff's limitations "in light of other acceptable medical
source statements of record."  Tr. 22.  The ALJ contrasts
FNP Engbretson's opinion with several "acceptable medical
sources" such as Kim Webster, M.D.; Amy Cowan, M.D.; J. Scott
Pritchard, D.O.; Peter Lebray, Ph.D.; and Amy Kobus, Ph.D.

The ALJ assigns significant weight to the opinions of
Drs. Webster and Cowan, who performed consultative physical
examinations of Plaintiff.  Tr. 21.  Dr. Webster met with
Plaintiff on April 11, 2007, and noted Plaintiff was able to walk
into the examination room without difficulty, was able to sit
comfortably and to take off her shoes without difficulty, and
easily transferred from the chair to the examination table.
Tr. 460.  After range-of-motion tests and a straight-leg raise,
Dr. Webster opined Plaintiff suffered from back pain, depression,
and hypothyroidism.  Tr. 463.  Dr. Webster, however, concluded
Plaintiff could stand or sit in an eight-hour workday without
restriction, could lift fifty pounds frequently, and did not have

22 - OPINION AND ORDER

any postural limitations.  Tr. 463.  Dr. Cowan made similar
conclusions about Plaintiff's impairments during a consultative
physical examination on May 7, 2009.  Tr. 641.  Dr. Cowan
concluded Plaintiff suffered from knee pain but would be able to
stand and to walk for six hours out of an eight-hour workday and
to sit for six hours out of an eight-hour workday.  Tr. 643.
Dr. Cowan restricted Plaintiff to occasional kneeling, crouching,
crawling, and found Plaintiff could frequently lift up to twenty
five pounds.  Tr. 637.

The ALJ also placed "great weight" on the testimony of
Dr. Pritchard, a nonexamining Disability Determination Services[2]
consultant.  Tr. 22.  Dr. Pritchard opined Plaintiff would be
able to stand and to walk or to sit for six hours out of an
eight-hour workday, could frequently lift 25 pounds, and could
occasionally lift 50 pounds.  Dr. Pritchard further found
Plaintiff's use of opiate medications prevented her from climbing
ladders, ropes, or scaffolds and required her to avoid
concentrated exposure to hazards.  Tr. 452-53, 455.

In evaluating Plaintiff's mental health, the ALJ also gave
"great weight" to the opinion of DDS consultant Peter Lebray,
Ph.D.  Tr. 22.  Dr. Lebray opined Plaintiff suffered from major

---

[2] Disability Determination Services (DDS) is a federally
funded state agency that makes eligibility determinations on
behalf and under the supervision of the Social Security
Administration pursuant to 42 U.S.C. § 421(a).

depressive disorder, but did not have any severe mental impairments and had only mild difficulties in maintaining social functioning, concentration, persistence, and pace. Tr. 447.

Finally, the ALJ gave "some weight but not full weight" to the opinions of licensed psychologist Amy M. Kobus, Ph.D., who examined Plaintiff on April 24, 2007, and characterized as "mild" the mild major depressive disorder that also "somewhat limited her functionality." Tr. 435. Dr. Kobus, however, noted Plaintiff's use of the computer for a four-hour period contradicted Plaintiff's complaints that she had difficulty concentrating. Tr. 435. Even though Plaintiff pointed out that the computer time was a prescribed part of Plaintiff's pain treatment, the reason for the computer use does not detract from the inference that Plaintiff is able to concentrate for significant periods of time. *See* Tr. 383.

On this record the Court concludes the ALJ did not err when she gave little weight to FNP Engbretson's opinion because the ALJ provided legally sufficient reasons supported by substantial evidence in the record for doing so.

**III. The ALJ did not err when she discounted the opinions of Drs. Kobus and Gordon.**

Plaintiff also alleges the ALJ erred by discounting the opinions of Amy M. Kobus, Ph.D., and Jerome S. Gordon, Ph.D.,

psychologists who performed consultative psychodiagnostic examinations of Plaintiff.

An ALJ may reject an examining or treating physician's opinion when it is inconsistent with the opinions of other treating or examining physicians if the ALJ makes "findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." *Thomas*, 278 F.3d at 957 (quoting *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)).  When the medical opinion of an examining or treating physician is uncontroverted, however, the ALJ must give "clear and convincing reasons" for rejecting it.  *Thomas*, 278 F.3d at 957.  *See also Lester v. Chater*, 81 F.3d 821, 830-32.

As noted, the ALJ gave "some weight but not full weight" to the opinion of Dr. Kobus.  Tr. 22.  Dr. Kobus examined Plaintiff on April 24, 2007, and found Plaintiff suffered from a "mild" major depressive disorder that "somewhat limited her functionality."  Tr. 435.  Dr. Kobus noted Plaintiff's use of the computer for a four-hour period contradicted Plaintiff's complaints that she had difficulty concentrating.  Tr. 435.

The ALJ also assigned "limited weight" to the opinion of Dr. Gordon, who examined Plaintiff on May 19, 2009; found Plaintiff suffered from severe major depressive disorder; and

assigned Plaintiff a GAF[3] of 42.  The ALJ gave limited weight to
Dr. Gordon's opinion on the ground that it was based on
Plaintiff's subjective complaints, which, as noted, the ALJ found
to be only partially credible.  Tr. 22.  The ALJ also noted
Dr. Gordon did not refer to the effectiveness of Plaintiff's
anti-depressant treatment, and the ALJ found Dr. Gordon's GAF
score "particularly questionable" because Dr. Gordon did not
provide any explanation or support for the score.  Tr. 22.

The ALJ also discounted both psychologists' opinions in
light of the Psychiatric Review Technique Form completed by DDS
consultant Peter Lebray, Ph.D.  Tr. 22.  The ALJ gave "great
weight" to the opinion of Dr. Lebray.  Tr. 22.  Dr. Lebray opined
Plaintiff had major depressive disorder, but he found Plaintiff
had only mild difficulties in maintaining social functioning,
concentration, persistence, and pace.  He also found Plaintiff
did not have any severe mental impairments.  Tr. 447.

The Court concludes on this record that the ALJ did not err
when he gave little weight to the opinions of Drs. Kobus and

---

[3] The GAF scale is used to report a clinician's judgment of
the patient's overall level of functioning on a scale of 1 to
100.  A GAF of 41-50 indicates "serious symptoms (e.g., suicidal
ideation, severe obsessional rituals, frequent shoplifting) or
any serious impairment in social, occupational, or school
functioning (*e.g.*, no friends, unable to keep a job)."  A GAF of
51-60 indicates moderate symptoms (*e.g.*, flat affect and
circumstantial speech, occasional panic attacks or moderate
difficulty in social, occupational, or school functioning).
*Diagnostic and Statistical Manual of Mental Disorders IV* (DSM-IV)
31-34 (4th ed. 2000).

Gordon because the ALJ provided legally sufficient reasons for doing so.

**IV.  The ALJ did not err by failing to satisfy her duty to develop the record.**

Plaintiff contends the ALJ erred by failing to develop the record regarding the side effects of Plaintiff's medications. Plaintiff also asserts certain testimony is missing from the transcript of the hearing before the ALJ.

The Commissioner bears the burden of developing the record. *Reed v. Massanari*, 270 F.3d 838, 841 (9th Cir. 2001).  When important medical evidence is incomplete, the ALJ has a duty to recontact the provider for clarification.  20 C.F.R. § 416.927(c)(2).  *See also Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983)(ALJ has a "special duty to fully and fairly develop the record" even when claimant is represented by an attorney). When making disability determinations,

> [i]f the evidence is consistent but we do not have sufficient evidence to decide whether you are disabled, or if after weighing the evidence we decide we cannot reach a conclusion about whether you are disabled, we will try to obtain additional evidence . . . .  We will request additional existing records, recontact your treating sources or any other examining sources, ask you to undergo a consultative examination at our expense, or ask you or others for more information.

20 C.F.R. § 404.1527(c)(3).

Plaintiff contends the ALJ erred by failing to develop the

27 – OPINION AND ORDER

record regarding the side effects of Plaintiff's narcotic medications.  Plaintiff testified Methadone causes drowsiness, sleeplessness, forgetfulness, and dry mouth, and these side effects would prevent Plaintiff from remaining seated for extended periods of time without falling asleep.  Tr. 44, 156, 162, 164, 203.

Contrary to Plaintiff's contention, however, the ALJ addressed the side effects of Plaintiff's medications by incorporating the following limitations in his assessment of Plaintiff's RFC:  "never climb ladders, ropes, or scaffolds, and should avoid concentrated hazards such as moving equipment and heights."  Tr. 21.  These restrictions were based in large part on the opinion of Dr. Pritchard, who recommended these restrictions specifically because of the side effects of Plaintiff's opiate prescriptions.  Tr. 21, 453, 455.

Plaintiff also contends the "--" marks in the transcript indicate instances of missing testimony.  These marks, however, appear to indicate places where one party interrupts another or where two parties are talking at the same time.  After reviewing the transcript, it does not appear there is any evidence of missing testimony.

On this record the Court concludes the ALJ did not fail to satisfy her duty to develop the record.

28 - OPINION AND ORDER

**V.    The ALJ did not err in his assessment of Plaintiff's RFC.**

Plaintiff contends the ALJ erred in her assessment of Plaintiff's RFC because the ALJ did not consider and include in the RFC:  1) Plaintiff's use of a cane to ambulate; 2) the combined effect of Plaintiff's hypertension, thyroid disease, depression, asthma, deafness, migraines, and degenerative joint disease; and 3) Plaintiff's mental limitations.

As noted, the assessment of a claimant's RFC is at the heart of Steps Four and Five of the sequential analysis engaged in by the ALJ when determining whether a claimant is disabled and whether she can still work despite her medical impairments.  An improper evaluation of the claimant's ability to perform specific work-related functions "could make the difference between a finding of 'disabled' and 'not disabled.'"  SSR 96-8p, at *4.

Plaintiff contends the ALJ erred by failing to incorporate Plaintiff's occasional use of a cane into the Plaintiff's RFC. The mention of Plaintiff using a cane appears only once in the record in response to the ALJ's questioning at the hearing. Tr. 41.  Moreover, on March 9, 2007, Plaintiff reported in her Function Report that she did not use a cane.  Tr. 172.  On March 9, 2007, Plaintiff's fiancé also noted in his Third-Party Function Report that Plaintiff did not use a cane.  Tr. 193.

Plaintiff also contends the ALJ erred by failing to consider the cumulative effect of all of Plaintiff's limitations when

29 - OPINION AND ORDER

determining Plaintiff's RFC.  Contrary to Plaintiff's contention,
however, the ALJ specifically included in Plaintiff's RFC
consideration of her "lumbar degenerative disc disease,
scoliosis, arthritis, depression, hypothyroidism[,] and obesity."
Tr. 23.

Plaintiff also contends the ALJ found in Steps Two and Three
that Plaintiff had moderate mental impairments in maintaining
concentration, persistence, or pace, but the ALJ failed to
include those limitations when he evaluated Plaintiff's RFC.  The
"limitations identified in the 'paragraph B' and 'paragraph C'
criteria," however,

> are not an RFC assessment but are used to
> rate the severity of mental impairment(s) at
> steps 2 and 3 of the sequential evaluation
> process. The mental RFC assessment used at
> steps 4 and 5 of the sequential evaluation
> process requires a more detailed assessment
> by itemizing various functions contained in
> the broad categories found in paragraphs B
> and C of the adult mental disorders listings
> in 12.00 of the Listing of Impairments, and
> summarized on the [Psychiatric Review
> Technique Form].

SSR 96-8p, at *4.  At Step Three the ALJ found Plaintiff had only
moderate limitations in social functioning, maintaining
concentration, persistence, or pace.  Tr. 17.  The ALJ also found
Plaintiff did not have a severe mental impairment because
Plaintiff's depression was improving with medication and was,
therefore, not expected to last twelve months.  Tr. 15. *See* 20
C.F.R. §§ 404.1509, 404.1520 (to be severe a disability must have

30 - OPINION AND ORDER

"lasted or must be expected to last for a continuous period of at least 12 months"). In the course of evaluating Plaintiff's RFC, the ALJ also gave great weight to Dr. Lebray's opinion as set out in the Psychiatric Review Technique Form that Plaintiff does not have severe mental impairments and that Plaintiff has only mild limitations in maintaining social functioning and in maintaining concentration, persistence, and pace. As noted, the ALJ also expressly included considerations of Plaintiff's "depression" in her evaluation of Plaintiff's RFC. Tr. 23.

Because the ALJ included all of Plaintiff's limitations in his evaluation of Plaintiff's RFC, the Court concludes the ALJ did not err in her assessment of Plaintiff's RFC.

## **CONCLUSION**

For these reasons, the Court **AFFIRMS** the decision of the Commissioner and **DISMISSES** this matter.

IT IS SO ORDERED.

DATED this 1st day of December, 2011.


/s/ Anna J. Brown

_____
ANNA J. BROWN
United States District Judge


31 – OPINION AND ORDER